Jerry C. Alexander
Texas Bar No. 00993500
Christopher A. Robison
Texas Bar No. 24035720
PASSMAN & JONES, P.C.
1201 Elm Street, Suite 2500
Dallas, Texas 75270-2599
P: (214) 742-2121
F: (214) 748-7949

Michael R. Rochelle
Texas Bar No. 17126700
Sean J. McCaffity
Texas Bar No. 24013122
ROCHELLE MCCULLOUGH L.L.P.
325 N. St. Paul, Suite 4500
Dallas, Texas 75201
P: (214) 953-0182
F: (214) 953-0185

Andrew B. Sommerman
Texas Bar No. 18842150
George (Tex) Quesada
Texas Bar No. 16427750
SOMMERMAN & QUESADA, L.L.P.
3811 Turtle Creek Blvd., Suite 1400
Dallas, Texas 75219
P: (214) 720-0720
F: (214) 720-0184

Jerry Kenneth (J.Ken) Johnson, II
Texas Bar No. 10746300
FLEMING NOLEN JEZ L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, Texas 77056
P: (713) 621-7944
F: (713) 621-9638

*Counsel for Plaintiff, Milo H. Segner, Jr.*
*As Liquidating Trustee of the PR Liquidating Trust*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| | § | **Case No. 09-33886** |
| **PROVIDENT ROYALTIES, LLC,** *et al.,* | § | **Chapter 11** |
| | § | **(Jointly Administered)** |
| **Debtors.** | § | |

| | | |
|---|---|---|
| | § | |
| **MILO H. SEGNER, JR., as Liquidating** | § | |
| **Trustee of the PR Liquidating Trust,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Case No. 3:12-CV-01318-B** |
| | § | |
| **RUTHVEN OIL & GAS, LLC,** | § | |
| **WENDELL HOLLAND,** | § | |
| **THE WENDELL AND** | § | |
| **KARI HOLLAND TRUST, and** | § | |
| **CIANNA RESOURCES, INC.** | § | |
| | § | |
| **Defendants.** | § | |

## TRUSTEE'S BRIEF IN SUPPORT OF
## <u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................1

II.    SUMMARY JUDGMENT GROUNDS...............................................................1

III.   SUMMARY JUDGMENT EVIDENCE ...............................................................2

IV.    FACTS.................................................................................................................3

      A.     Transfers of Debtors' Property within Two Years of the Bankruptcy Filing..........3

      B.     Intent to Defraud .........................................................................................3

            1.     The Guilty Pleas Prove Intent to Defraud....................................................3

            2.     The Cash Flow Analysis Demonstrates how the Fraud Occurred and Details the Ponzi Flow of Funds ................................................................5

      C.     Lack of Objective Good Faith ......................................................................8

            1.     Longstanding Blimline Associates ...............................................................8

            2.     Learning not to Trust Blimline ....................................................................8

            3.     Agreeing to Become an Insider ...................................................................9

            4.     Continuing Warnings, Continually Disregarded ..........................................9

            5.     Business Practices Calling Good Faith into Question .................................10

            6.     The Compensation Arrangement so Lopsidedly Favored Ruthven, it had to Know Something was Wrong ...............................................................10

      D.     Transfers to Defendant Ruthven were not for Value .....................................11

V.     ARGUMENT ......................................................................................................12

      A.     Summary Judgment Standard ......................................................................12

      B.     Fraudulent Transfers Occurred As a Matter of Law......................................13

            1.     Transfers Occurred ...................................................................................13

            2.     Of the Debtor's Interest in Property ..........................................................14

            3.     Within Two Years of the Bankruptcy Petition's Filing...............................15

            4.     With Intent to Hinder, Delay or Defraud ...................................................15

            5.     No Affirmative Defense of Value and Good Faith......................................21

VI.    CONCLUSION...................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Am. Cancer Soc'y v. Cook*, 675 F.3d 524, 528 (5th Cir. 2012) ....................................................16

*Barnhill v. Johnson*, 503 U.S. 393, 398, 112 S. Ct. 1386, 1389, 118 L. Ed. 2d 39 (1992) ...........14

*Besing v. Hawthorne*, 981 F.2d 1488, 1492 (5th Cir. 1993).......................................................14

*Consove v. Cohen*, 701 F.2d 978, 984 (1st Cir. 1983)................................................................21

*Cunningham v. Brown*, 265 U.S. 1, 7–9, 44 S. Ct. 424, 68 L. Ed. 873 (1924)............................16

*Dahar v. Jackson*, 318 B.R. 5, 14 (Bankr. D.N.H. 2004).........................................................21

*Drenis v. Haligiannis,* 452 F. Supp. 2d. 418, 429 (S.D.N.Y. 2006).........................................18

*Emerson v. Maples,* 161 B.R. 644, 648 (Bankr. W.D. Tenn. 1993), *aff'd*, 1995 US. App. LEXIS
    16053 (6th Cir. 1995) .......................................................................................................18, 20

*Gouveia v. Cahillane*, 408 B.R. 175, 191 (Bankr. N.D. Ind. 2009) .............................................18

*Haverda v. Hays Cty.,* 723 F. 3d 586, 591 (5th Cir. 2013)........................................................12

*Hayes v. Palm Seedlings Partners*, 916 F.2d 528, 535–536 (9th Cir. 1990)............................18

*Hayes v. Palm Seedlings Partners-A*, 916 F.2d 528, 531 (9th Cir. 1990)..................................16

*Hinsley v. Boudloche*, 201 F. 3d 638, 644 (5th Cir. 2000) ........................................................24

*In re Rangers Baseball*, 498 B.R. 679, 712 (N.D.Tex.Bankr. 2013).........................................15

*In re Rodriguez*, 209 B.R. 424,433 (Bankr. S.D. Tex. 1997)....................................................20

*In re Slatkin,* 310 B.R. 740, 745 (C.D. Cal. 2004) ..................................................................20

*In re Slatkin*, 525 F.3d 805, 812-13 (9th Cir. 2008) ................................................................19

*Jackson v. Mishkin*, 263 B.R. 406, 444–445 (S.D.N.Y. 2001) .................................................18

*Janvey v. Alguire*, 628 F.3d 164, 175 (5th Cir. 2010) .............................................................17

*Janvey v. Alguire*, 647 F.3d 585, 597 (5th Cir. 2011) .............................................................16

*Janvey v. Democratic Senatorial Campaign Committee, Inc., et al.*, 793 F.Supp. 2d 825, 834,
    fn.9 (N.D. Tex. 2011), aff'd, 712 F.3d 185, 199 (5th Cir. 2013) .............................................19

*Jimmy Swaggart Ministries v. Hayes*, 310 F. 3d 796, (5th Cir. 2002).....................................22

*Leonard v. Coolidge*, 367 B.R. 207, 221 (Bankr. D. Nev. 2007) ...........................................18, 21

*Martino v. Edison Worldwide Capital*, 189 B.R. 425, 439 (Bankr. N.D. Ill.1995)......................20

*McNamara v. PFS*, 334 F.3d 239, 243 (3d Cir. 2003) ...........................................................21

*Merrill v. Abbott,* 77 B.R. 843 (D. Utah 1987)........................................................................18

*O'Cheskey v. Horton*, 2011 Bankr. LEXIS 3837, 65, 67 .....................................................21, 23

*Plotkin v. Pomona Valley Imports, Inc.* 199 B.R. 709, 717 (B.A.P. 9th Cir. 1996).....................18

*Quilling v. Schonsky*, 247 Fed. Appx. 583, 586 (5th Cir. 2007)................................................17

*Quilling, Receiver v. 3D Marketing, LLC*, 2007 WL 631281, *2 (N.D. Tex.)..............................17

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151, 120 S. Ct. 2097, 147 L. Ed. 2d
    105 (2000) .......................................................................................................................13

S.Rep. No. 95-989, 95th Cong.2d Sess. 27 (1978)..................................................................14

*Stevenson v. J.C. Bradford & Co.,* 277 F.3d 838, 849–50 (6th Cir. 2002)................................14

*Vaughn*, 665 F.3d at 635 .......................................................................................................13

*Warfield v. Byron*, 436 F. 3d 551 (5th Cir. 2006)..........................................................17, 22, 24

*Warsco v. Preferred Tech. Group*, 258 F.3d 557, 564 (7th Cir. 2001) .....................................14

*Weaver v. Kellogg*, 216 B.R. 563, 573 (Bankr. S.D. Tex. 1997)..............................................14

**Statutes**

11 U. S. C. § 101 (54) (D) ............................................................................14
11 U. S. C. § 548..................................................................................14, 15
11 U. S. C. § 541.........................................................................................14

**Rules**

Fed. R. Civ. P. 56......................................................................................1, 12
Fed. R. Evid. 803 (22) ..................................................................................18

**Other Authorities**

Mark A. McDermott, *Ponzi Schemes and the Law of Fraudulent and Preferential Transfers*, 72 Am. Bankr. L.J. 157, 157–58 (1998) ....................................................16

## TRUSTEE'S BRIEF IN SUPPORT OF
## MOTION FOR PARTIAL SUMMARY JUDGMENT

### I.   INTRODUCTION

Plaintiff Milo H. Segner, Jr., as Liquidating Trustee of the PR Liquidating Trust ("Trustee") moves for Partial Summary Judgment under FED. R. CIV. P. 56. The Motion seeks avoidance and recovery of pre-bankruptcy fraudulent transfers of almost $49 million of Debtors' Property (*i.e.*, Provident and certain of its entities; collectively referred to as "Provident" or the "Debtors") to the immediate transferee, Defendant Ruthven Oil & Gas, LLC ("Ruthven"). This Motion and Brief establish the transfers and requisite intent to defraud under the evidence and relevant authority, as well as the lack of evidence to support all of Defendant's affirmative defenses. For reasons below, the Trustee is entitled to judgment on Count 1 of Plaintiff's First Amended Complaint ("Complaint"), as well as judgment on all affirmative defenses Ruthven has asserted.

### II.   SUMMARY JUDGMENT GROUNDS

The Trustee filed his complaint in the Bankruptcy Court to recover fraudulent transfers by the Defendants under 11 U.S.C. § 548 (a) (1) (A). Defendants obtained withdrawal of the reference to this Court by demanding a jury trial. The Complaint, now pending in this Court seeks recovery on eight counts covering fraudulent transfer, fraud, and exemplary damages. The Trustee now seeks summary judgment on Count 1 (transfer with intent to defraud), in the amount of $48,812,882.24 against Ruthven, the first recipient of the transferred funds.

Count 1 requires proof of four elements: (1) a transfer (2) of the debtor's property (3) within two years of the bankruptcy filing (4) with actual intent to hinder, delay or defraud. Ruthven has admitted the first three elements of Count 1. Through discovery, the Trustee established the fourth element –Provident's actual intent to hinder, delay or defraud – in two ways:

- Extensive and detailed analysis of the circuitous transfers of later investor money to pay earlier investor dividends that exceeded the profits of the Provident entities involved; and

- Eleven guilty pleas, of individuals central to the fraud, that admit using later investor funds to pay dividends to earlier investors in the course of two overlapping Ponzi schemes that centered on the supposed oil and gas expertise of Joseph Blimline ("Blimline");

Either of these methods of proof, by itself, establishes fraudulent intent, as required by 11 U.S.C.

§ 548(a)(1)(A).

The Trustee's proof of the four elements shifted the burden to Ruthven as a transferee to establish an affirmative defense, but Ruthven cannot do so, since discovery also established that: (1) Ruthven and its principal Wendell Holland ("Holland") supplied oil and gas "assets" to con artist Joseph Blimline over a six-year period to support his series of fraudulent schemes; and (2) Ruthven was objectively aware of numerous facts which refute its defense of dealing for value and in good faith.

Accordingly, the Trustee is entitled to summary judgment in the amount of $48,812,882.24 against Ruthven.

### III.   SUMMARY JUDGMENT EVIDENCE

The summary judgment evidence submitted here includes:

- the live pleadings, for the purpose of showing the parties' contentions;[1]

- the Declaration of Dennis L. Roossien, Jr. and accompanying exhibits;[2]

- the Declaration of L. Ford Clark and accompanying exhibits;[3]

- excerpts from the depositions of Defendants Wendell Holland[4], Kari Holland[5], Kyle Shutt[6] and Defendants' Expert James Hatcher[7]; and

- Ruthven's Responses to Requests for Admissions.[8]

---

[1] Complaint, Appx. 000001-000022; "First Amended Answer", Dkt. 43, Appx pp. 000023-000044.
[2] "Roossien Declaration", Appx pp. 000045-000918.
[3] "Clark Declaration", Appx pp. 000919-000982.
[4] "Holland Deposition", Appx pp. 000983-001030.
[5] "Kari Holland Deposition", Appx pp. 001031-001043.
[6] "Kyle Shutt Deposition", Appx pp. 001044-001071.
[7] "James Hatcher Deposition", Appx pp. 001077-001083.
[8] *See* Summary Chart and Ruthven's Responses to Requests for Admissions, Appx pp. 1084-1111.

## IV.   FACTS

### A.   Transfers of Debtors' Property within Two Years of the Bankruptcy Filing

The books and records of the Provident Debtors conclusively establish that they made —

and Ruthven admitted receiving — a series of transfers from June 23, 2007 through the

bankruptcy filing on June 22, 2009, of at least $48,812,882.24.[9]

### B.   Intent to Defraud

Two separate bodies of evidence conclusively establish the Provident Ponzi scheme, and

therefore Provident's intent to defraud:

- the admissions in eleven separate guilty pleas, demonstrating that Joseph Blimline perpetrated two successive and intertwined fraudulent schemes, using later investor money to pay inflated returns to earlier investors; and

- a detailed cash flow analysis of the dozens of corporate entities through which the schemes were perpetrated.

#### 1.   The Guilty Pleas Prove Intent to Defraud

Joseph Blimline is presently serving a twelve-year sentence in the Federal Correctional

Institution at Big Spring, Texas.  On June 21 and July 7, 2010, he entered two guilty pleas, one

regarding his actions directing the "JRR Enterprise," which ran from 2004 through 2007;[10] and

one regarding the Provident Royalties scheme, which ran from mid-2006 through January,

2009.[11]

---

[9] The Complaint provides a list of the transfers as Exhibit A to the Complaint (In re Provident Royalties, LLC, et al., Case No. 11-03385, at 13, ¶40 & at 16, ¶55; Dkt. 39-1, N.D.Tex.Bankr., Appx pp. 000023-000024,) (see copy attached as Exhibit A; *see also* Roossien Declaration at 33; ¶90, Ex. 82, Appx pp. 000487-000488) and, in their Answer, Defendants admitted at ¶32 that they received the total amount alleged of $56,185,027.14, and that they are without sufficient information to contest the date or amounts of these transfers (In re Provident Royalties, LLC, et al., Case No. 11-03385, Dkt. 43 at 10, ¶40 & at 12, ¶55 N.D.Tex.Bankr., Appx pp. 000034 and Appx pp. 000036.) In responses to Requests for Admissions, Ruthven admitted to transfers totaling $48,812,882.24 (see summary chart and admission responses, Appx. pp. 1084-1111). In this Motion, Plaintiffs seek only the amounts avoidable as fraudulent transfers within two years of the filing of the bankruptcy, and, of that subset, only those amounts that Ruthven has admitted receiving.  That total is $48,812,882.24.
[10] Roossien Declaration, Ex. 35, Appx pp. 000190-000202.
[11] Roossien Declaration, Ex. 73 at 4-5, Appx pp. 000394-000395; Ex. 74 at 4-5, Appx pp. 000415-000416.

### a)      The JRR Enterprise Guilty Pleas

In his JRR Enterprise plea, Blimline admitted he and his associates deliberately concealed the fact that the entities involved in the scheme did not make profits sufficient to pay the promised returns.  He also admitted that he and his co-conspirators raised new money from later investors and used part of it to pay returns to earlier investors.[12]

The co-conspirators' testimony supports summary judgment:

- Blimline co-conspirators Eric Merkle and Jay Merkle's guilty pleas stated that they discovered in 2004 that "J.B." was using new investor money to pay sham dividends because "J.B. and S.S. had never had existing wells sufficient to pay promised returns."[13]

- Blimline co-conspirator Charles Coppess stated: "Eric Merkle admitted new PBI investor funds were being used to pay 'earnings,' and/or principal to these investors to 'keep things quiet,'" and that he "understood from his financial background that using new investor funds to pay 'earnings' to previous investors constituted an illegal 'Ponzi scheme,'" and that he deliberately omitted these facts "because he knew it would dissuade investment."[14]

- Blimline co-conspirator Craig Massey gave a specific example in which an investor was sent later investor money: "because Longhorn Energy did not in fact have oil & gas revenue to pay the obligation."[15]

- Blimline co-conspirator Sharon Stickel (the "S.S." referred to in the Merkle guilty pleas above) admitted that in "mid-2004" she confronted J.B. with the fact that they had promised far more in earnings than they could actually pay from existing well production [but, even so, she] continued to assist J.B. in raising money from new investors, knowing that the JRR Enterprise was insolvent, and was actually paying 'earnings' with new investor funds.[16]

### b)      The Provident Guilty Pleas

In his Provident factual statement filed with his sealed guilty plea, Blimline admitted that from "September 2006 through in or about February 1, 2009" a fraudulent scheme took place in which, among other things, investors were affirmatively told that "the proceeds raised by one PPM Project would not be used to pay dividends for any other PPM project" when, in fact,

---

[12] Roossien Declaration, Ex. 35, at 2-4, Appx pp. 000190-000191.
[13] Roossien Declaration, Ex. 73 at 4-5, Appx pp. 000394-000395; Ex. 74 at 4-5, Appx pp. 000415-000416.
[14] Roossien Declaration, Ex. 77 at 4-5, Appx pp. 000462-000463.
[15] Roossien Declaration, Ex. 75 at 6, Appx pp. 000438.
[16] Roossien Declaration, Ex. 76 at 3, Appx pp. 000450.

"Provident, through PM, BC, and HH, used investor funds from some PPM Projects to pay investor dividends in other PPM Projects."[17]

Blimline's four Provident co-conspirators entered guilty pleas with the same key admission: investors were falsely told that "proceeds raised by one PPM project would not be used to pay investor dividends in any other PPM project," each as to the time period for which they admitted culpable knowledge.[18]

With regard to the intertwining of the schemes, the Blimline and Melbye [former Provident president Russell Melbye] guilty pleas admit that Provident investors were not informed that "Provident, through Melbye, BC, and HH, entered into almost $93 million in transactions with entities controlled by Blimline, including extending $30 million in unsecured loans to Blimline".[19]

### 2. The Cash Flow Analysis Demonstrates how the Fraud Occurred and Details the Ponzi Flow of Funds

To establish as a matter of law that the Provident Debtors engaged in a Ponzi scheme, the Trustee comprehensively reviewed and mapped not only Provident's books and records, but also those of representative entities in the precursor JRR Enterprise.[20]  The analysis provided some of the proof for this motion.

The analysis first showed that the JRR Enterprise and three other precursor schemes established a pattern, where unprofitable corporations paid dividends to earlier investors using later investor money.[21]

---

[17] Roossien Declaration, Ex. 36 at 1, 2 – item b(2), 3 – item (c)(4), Appx pp. 000203-000205.  The abbreviation "PPM" stands for "Private Placement Memorandum," which was the primary solicitation document prepared for distribution to potential investors.

[18] Roossien Declaration, Ex. 78 at 3-4, Appx pp. 000474-000475; Ex. 80 at 2, Appx pp. 000482; Ex. 79 at 2, Appx pp. 000479; Ex. 81 at 2, Appx pp. 000485.

[19] Roossien Declaration, at 13-16, ¶¶30-39, Appx pp. 000057-000060.

[20] Roossien Declaration at 6-13, ¶¶14, Appx pp. 000050-000057; at 18-28, Appx pp. 000062-000072; Exs. 1-34, Appx pp. 00083-000189; and Ex. 39, Appx pp. 000247.

[21] Roossien Declaration, Ex. 36 at 2, Appx pp. 000204; Ex. 78 at 3-4, Appx pp. 000474-000475; Ex. 80 at 2, Appx pp. 000482; Ex. 79 at 2, Appx pp. 000479; Ex. 81 at 2, Appx pp. 000485.

The methodical and thorough analysis continued with the Provident Debtors. The data was first placed into categories, [22] which produced a series of Excel charts with thousands of entries, each line showing the nature of the transfer, the date, the person depositing or receiving funds, and the amount. When completed, the analysis showed that the Ponzi pattern continued: unprofitable Provident entities paid dividends to earlier investors by using later investor money, and new money from Provident investors was also being transferred back to JRR Enterprise entities and other entities controlled by Blimline.

The following example, which traces the handling of investor Warren Jackman's money will demonstrate what occurs countless times in these charts:

Example of SR5 Transaction Detail:[23]

| 10001 | Investment | | 02-21-08 | JACKMAN WARREN | Warren M. Jackman | | 500,000.00 |
|---|---|---|---|---|---|---|---|

These lines were then sorted by category and by month, and then totaled, which produced spreadsheets with entries totaled as follows:

Example of SR5 Totals by Month – February 2008 – All Investments:[24]

| 10001 | Investment | | 02-21-08 | JACKMAN WARREN | Warren M. Jackman | | 500,000.00 |
|---|---|---|---|---|---|---|---|
| | **Investment Total** | | | | | | 500,000.00 |

Using these individual monthly totals, a list of monthly entity totals was prepared for each category. The completed charts allow the sources and uses of funds to be followed through each of the Provident Debtors (see larger copy attached as Exhibit 11 to Roossien Declaration):[25]

---

[22] Roossien Declaration at 9-10, ¶¶21-23, Appx pp. 000053-000054; Exs. 1-2, Appx pp. 000083-000093.

[23] Roossien Declaration at 9-10, ¶¶21-23, Appx pp. 000053-000054; Ex. 2, Appx pp. 000093.

[24] Roossien Declaration at 10, ¶23, Appx pp. 000054; Ex. 2, Appx pp. 000093.

[25] Roossien Declaration at 11-12, ¶24, Appx pp. 000055-000056; Ex. 11, Appx pp. 000141; see also at 12, ¶26, Appx pp. 000056; Exs. 9-27, Appx pp. 000139-000157; and Ex. 39, Appx pp. 000247.

|  | | | | | SR5 | | | | | | | | | | | |
|  | | | | | Cash Inflows and Outflows | | | | | | | | | | | |
|  | | | | | By Month | | | | | | | | | | | |
| Date | Investor Receipts | Revenue Receipts | Well Refunds | BD Commissions | Payments to Investors | Well Costs | Property Acquisitions | Drilling Costs | Blimline | Michigan | Admin Expense | Transfers among Entities | Unidentfd Acctg Entries | Original Cash | Funds to Earlier Shales | Funds from Later Shales |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January-07 | | | | | | | | | | | | | | | | |
| February-07 | | | | | | | | | | | | | | | | |
| March-07 | | | | | | | | | | | | | | | | |
| April-07 | | | | | | | | | | | | | | | | |
| May-07 | | | | | | | | | | | | | | | | |
| June-07 | | | | | | | | | | | | | | | | |
| July-07 | | | | | | | | | | | | | | | | |
| August-07 | | | | | | | | | | | | | | | | |
| September-07 | 3,070,000 | | | (113,825) | | | (27,454) | | | (1,189,056) | (1,507) | | | 1,738,157 | | |
| October-07 | 13,742,000 | | | (1,463,600) | | (95,303) | (3,475,711) | | (3,128,654) | | (63,011) | (2,772,000) | | 4,481,878 | (2,772,000) | |
| November-07 | 11,661,500 | | | (1,781,200) | | (64,184) | (2,186,591) | | (4,160,451) | | (17,869) | 35,375 | | 7,933,083 | | |
| December-07 | 905,000 | | | (268,925) | | (75,897) | (3,345,848) | (3,036) | (3,632,221) | | (1,300) | 304,680 | 29,162 | 1,510,856 | | |
| January-08 | | 1,574 | | (3,625) | (11,037) | (68,011) | (741,000) | (22,019) | | | 0 | | 5,597 | 666,738 | | |
| February-08 | 500,000 | 1,720 | 55,429 | (73,950) | (148,621) | | | | (512) | (300,000) | | 108,377 | | 700,804 | | |
| March-08 | | 7,546 | | | (347,170) | | 2,407 | | | | | | | 363,587 | | |
| April-08 | | (5,254) | | | (436,305) | (12,121) | | | (4,349) | | | 360,000 | | 0 | | |
| May-08 | | 6,499 | | | (441,450) | | | | (6,553) | | | 312,000 | | | | (312,000) |
| June-08 | | 5,698 | | | (443,048) | 95,303 | | | (8,480) | | (100) | 590,118 | | | | (902,118) |
| July-08 | | 8,164 | | | (442,575) | | | | 14,442 | | (17,111) | 230,000 | | | | (1,132,118) |
| August-08 | | 9,925 | | | (448,625) | | | | (1,391) | | (2,915) | 267,381 | | | | (1,399,499) |
| September-08 | | 6,481 | | | (448,575) | | | | (1,054) | | (27) | 450,000 | | | | (1,849,499) |
| October-08 | | | | | (448,950) | | | | | | | 625,000 | (32,948) | | | (2,474,499) |
| November-08 | | | | | (448,575) | | | | | | 24 | (1,714) | | | | (2,472,785) |
| December-08 | | | | | (448,575) | | | | | | 12 | 705,000 | | | | (3,177,785) |
| January-09 | | | | | | | | | | | 55 | 174,252 | | | | (3,352,038) |
| Total | 29,878,500 | 42,353 | 55,429 | (3,705,125) | (4,513,505) | (220,214) | (9,774,197) | (32,952) | (11,221,326) | (1,189,056) | (103,749) | | | | | |

The chart above demonstrates that Provident Debtor Shale Royalties 5, LLC, was not profitable.

Telling details include the following:

- Over $29 million contributed by investors produced only $42,353 in income.

- $4,513,505 in dividends were paid without any supporting profits.

- Dividends paid came not from revenue, but from later SR5 investors' funds, and thereafter from investors in later Provident Shale entities.

The analysis goes through multiple such examples,[26] as do the charts for each Provident debtor.

Roossien's supporting declaration also explains how particular deposits of investor funds — such as the foregoing example following the path of Warren Jackman's $500,000 — can be traced through both the accounting records and bank records, which reveals that his funds paid the next month's dividends to the earlier SR5 investors.[27]

---

[26] Roossien Declaration at 17-19, ¶¶45-53, Appx pp. 000061-000063; Ex. 39, Appx pp. 000247; see also at 19-27, Appx pp. 000063-000071 (& supporting exhibits).
[27] Roossien Declaration at 22-25, ¶¶67-71, Appx pp. 000066-000069; Ex. 11, Appx pp. 000141; 58-65, Appx pp. 000284-000307.

### C.      Lack of Objective Good Faith

#### 1.      Longstanding Blimline Associates

Blimline and his JRR Enterprise were doing deals with Defendant Ruthven and its principal Holland by at least June, 2003.[28]  Six months later, the relationship had become sufficiently close that Holland was serving as Blimline's contractual Limited Agent for transactions in Caddo County, Oklahoma.[29]

#### 2.      Learning not to Trust Blimline

Blimline's guilty plea stipulates that by June, 2003, the JRR Enterprise had insufficient revenue to pay promised earnings.[30]  By the middle of 2005, the Michigan scheme was coming apart, and Blimline was in arrears in paying Holland for acreage.[31]  Soon after, the following email gave Holland a clear look at how Blimline and the Merkles did business:

> We are hoping to have some mineral funds in next week.
> I would like to propose the following:
> We will continue to work towards paying the 2nd installment that is past due.
> Once it is paid off including late fees we will then immediately work towards paying off the third installment, as soon as funds are raised.[32]

Unaccountably, this admission of paying old debts with new investments did not give Holland pause; to the contrary, he proceeded despite knowing that Blimline was living hand-to-mouth on investor money.

The same problems with Blimline continued to plague Holland a year later.  In an email dated August 4, 2006, Holland said that Blimline's $285,390 in bounced checks "have put me in a real bind on this end" and Blimline must "Clean these up in the next 48 hours or we will not be able to do business anymore."[33]  Six weeks later, things were no better, and Holland was

---

[28] Roossien Declaration, Ex. 102: Lincoln County deed, PRLP1213291-2, Appx pp.  000780-000781.
[29] Roossien Declaration, Ex. 103: Blimline 016930-016939, Appx pp.  000782-000792.
[30] Roossien Declaration, Ex. 35, p. 3: Blimline guilty plea, Appx pp. 000192.
[31] Roossien Declaration, Ex. 104: 5/31/05, Appx pp.  00793; Ex. 105: 6/01/05 emails, Appx pp.  000794.
[32] Roossien Declaration, Ex. 106: 6/10/05 email, Appx pp. 000795.
[33] Roossien Declaration, Ex. 107: 8/4/06 email, Appx pp.  000796.

demanding $522,029 in wires (not checks) to close deals within the next week, at the same time

complaining that "These dropped promises are affecting my reputation and my health, two things

that I will not compromise for you."[34]

### 3.      Agreeing to Become an Insider

Three months later – and harm to reputation notwithstanding – Holland agreed to serve

on the Board of Advisors of Shale Royalties 3, Provident's latest securities offering.[35] Holland

later explained that he didn't really want to do it, but did so because Blimline "had the potential

to be a big client."[36]

### 4.      Continuing Warnings, Continually Disregarded

Ruthven and Holland received additional information or requests that would have put

reasonable individuals on inquiry:

- Joe Blimline instructed Holland to violate the reporting and payment requirements of the Oklahoma Documentary Stamp Tax.[37]

- Holland was aware Blimline was in business with the Merkles.[38]

- Holland knew from discussions with Blimline that the Merkles were in trouble in Michigan, were bad people, had gotten indicted, and "had gotten what they deserved."[39]

- Holland undertook no investigation of the Merkles' or Blimline's business model even after notice of the indictment.[40]

- Holland continued to do business with Joe Blimline's companies, even after Blimline had pleaded guilty to federal charges arising out of prior transactions.[41]

Holland's testimony and records indicate that he consciously disregarded this information, made

no further inquiry, and kept doing business with Blimline on Ruthven's behalf.[42]

---

[34] Roossien Declaration, Ex. 108: 9/23/06 email, Appx pp. 000797.

[35] Roossien Declaration, Ex. 109: 12/29/06 email; Ex. 110: Board/Officer/Stockholder/Employee Questionnaire for Shale 3; Ex. 111: Executive Summary circulated for Shale 3 PPM; Ex. 112: Shale 3 management and advisory board biographies, Appx pp. 000798-000810.

[36] Holland, p. 144.2-7, Appx pp. 001018.

[37] Holland, pp. 94.10-17, Appx pp. 001006; 96.21-24, Appx pp. 001007.

[38] Holland pp. 47.25-48.7, Appx pp. 000996-000997.

[39] Holland pp. 48.5-49.6, Appx pp. 000997-000998.

[40] Holland, pp. 44.14-46.6, Appx pp. 000993-000995; 51.8-52.22, Appx pp. 000999-001000.

[41] Roossien Declaration, Ex. 113: Phoenix Petroleum deed to Holland, 9/21/10, Appx pp. 000811; Holland p. 53.14-22, Appx pp. 001001; pp. 168.20-170.18, Appx pp. 001022-001024; see also Roossien Declaration, Exs. 35-36, Blimline Guilty Pleas, Appx pp. 000190-000202.

### 5.    Business Practices Calling Good Faith into Question

Defendant Ruthven and its principal Holland maintained surprisingly skimpy records, offering the following excuses:

- Lightning strikes;[43]
- Computer crashes;[44]
- Being "a double-delete guy at the end of every day" on email;[45] and
- Destroying hard drives in 2009 as part of a "big document shred."[46]

The 2009 document destruction is particularly telling, given that the Provident civil enforcement action commenced in the middle of 2009.[47] Further, Defendants' conduct is inconsistent with industry practice: even one of their own experts testified that a mineral buyer is wise to maintain his records, since they often save him time in the future. [48]

### 6.    The Compensation Arrangement so Lopsidedly Favored Ruthven, it had to Know Something was Wrong

One characteristic of a Ponzi scheme is that the deal is "too good to be true."   In Provident's case, that axiom extended to Ruthven, which knew that the actual work involved was being done by others for a tiny fraction of the tens of millions that it was charging Provident.[49]

While Ruthven was providing limited services for Provident, it was also raising the purchase price by fifty percent on each flip, even though nothing in the market justified a doubling of the price.[50] For Ruthven to earn a 50% return, one would expect it not only to have been expending expending considerable effort, but also incurring considerable risk.

---

[42] Holland pp. 48.5-49.6, Appx pp.  000997-000998; pp. 51.8-52.22, Appx pp. 000999-001000.

[43] Holland, pp. 58.3-59.8, Appx pp.  001002-001003.

[44] Holland, pp. 60.23-61.11, Appx pp. 001004-001005.

[45] Holland, as corporate representative of the Holland Trust, 2/27/13 deposition, p. 41.4-.24, Appx pp. 001074.

[46] Holland, as corporate representative of the Holland Trust, 2/27/13 deposition, p. 41.25-42.25, Appx pp. 001074-001075.

[47] Roossien Declaration at 2, Appx pp. 000046.

[48] Hatcher pp. 45.5-46.4, Appx pp. 001080-001081.

[49] Holland pp. 14.15-15.5, Appx pp. 000991-000992; pp. 110.18-111.12, Appx pp. 001008-001009; p. 113.3-8, Appx pp. 001010; pp. 146.19-147.25, Appx pp. 001019-001020; Shutt pp. 25.6-26.1, Appx pp. 001050-001051.

[50] Holland, pp. 202.12-203.2, Appx pp. 001026-001027; Shutt pp. 117.22-118.1, Appx pp. 001057-001058.

Ruthven, however, testified that it assumed virtually no financial risk, since each purchase was structured so that it paid the landowner *only* after Provident had paid Ruthven.[51] And although Holland testified that Ruthven had approximately $1.5 million in outstanding purchases pending when Provident ceased making purchases, he also testified that Ruthven was able to "un-wind" the transactions without having to pay the landowners.[52]  As for Ruthven's title warranty, Holland claimed a dozen title failures requiring refunds occurred.  But he added that he got the money back for the failures from Shutt, who in turn had to get it from the landowner.[53]  In contrast, Shutt remembers giving no refunds for title failure.[54]  In any event, Defendants did not consider the warranty risk large enough to purchase insurance for it.[55]

As a result of the large amount of money made from Provident, Holland retired when his work for Provident ended.[56]

### D.  Transfers to Defendant Ruthven were not for Value

The Trustee attached to the Complaint an itemized list of transfers, showing Provident's payment to Ruthven.[57]  Ruthven's Answer provides only the bald affirmative defense that it provided "value" for the transfers.[58]  Not only does Ruthven admit that it made no effort to determine if the property conveyed to Provident was of any particular value, Holland also admitted that he was personally unqualified to value it.[59]

When asked in discovery to "describe the actions you took to assure yourself that purchases reflected market value," Holland responded with circular reasoning:

---

[51] Holland pp. 46.23-47.13, Appx pp. 000995-000996; pp. 142.22-143.4, Appx pp. 001016-001017; Shutt p. 115.21-116.1, Appx pp. 001055-001056.
[52] Holland p. 153.4-9, Appx pp. 001021; p. 196.8-17, Appx pp. 001025.
[53] Holland, pp. 113.20-114.18, Appx pp. 001010-001011.
[54] Shutt, pp. 169.12-170.22, Appx pp. 001059-001060.
[55] Kari. Holland, p. 89.5-8, Appx pp. 001038.
[56] Shutt, p. 41.2-9, Appx pp. 001052; pp. 55.25-56.7, Appx pp. 001053-001054; Kari Holland, p. 128.22-130.6, Appx pp. 001039-001041.
[57] Complaint, Ex. A thereto, Dkt. 39-1, Appx pp. 000023-000024.
[58] First Amended Answer at 18, Appx pp. 000042.
[59] Holland, pp.134.10-135.7, Appx pp. 001014-001015.

> Accepting the definition of "market value" to be that which a willing buyer and a willing seller agree on a price for a particular product. Ruthven was either paid a commission agreed in advance or was given a "delivered to" price where Provident stipulated what, as a willing buyer it was willing to pay for minerals in a specified area.[60]

At the same time, Provident records concerning purchases from Ruthven indicate that Provident spent at least $29 million of its funds to buy the so-called "Spindletop" acreage.[61]  That acreage was actually an old JRR Enterprise undertaking[62] in which Blimline had already drilled three dry holes.[63]  Provident offering materials centered not on Spindletop, but rather on the then-popular shale gas boom.[64]  Indeed, the Spindletop acreage is not located in the path of the shale gas plays of northeastern and central Oklahoma, but rather in the southwestern corner of the state, where one finds large granite formations.[65]  An expert retained to study the matter found so little historical exploration interest in the area that he concluded there was no need to pay more than a nominal amount for the acreage.[66]

## V.    ARGUMENT

### A.    Summary Judgment Standards

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56 (a).  A genuine dispute as to a material fact exists when, after considering the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, a court determines that the evidence is such that a reasonable jury could still return a verdict for the party opposing the motion. *Haverda v. Hays Cty.,* 723 F. 3d 586, 591 (5th Cir. 2013), citing

---

[60] Roossien Declaration, Ex. 115, Wendell Holland Response to Interrogatory No. 21, Appx pp. 000899.

[61] Roossien Declaration at 36, Appx pp. 000080; Ex. 99 at 12, Appx pp. 000700.

[62] Roossien Declaration at 34-35, Appx pp. 000078-000079; Exs. 90-92, Appx pp. 000503-000642.

[63] Roossien Declaration at 34-35, Appx pp. 000078-000079; Ex. 90, Appx pp. 000503-000628; Ex. 94, Appx pp. 000656-000659; Ex. 95, Appx pp. 000660-000675.

[64] Roossien Declaration at 34, Appx pp. 000078; Ex. 88, Appx pp. 000498.

[65] Roossien Declaration at 34, Appx pp. 000078; Ex. 84, Appx pp. 000493; Ex. 86, Appx pp. 000495; Ex. 87, Appx pp. 000496-000497; Ex. 89, Appx pp. 000499.

[66] "Clark Declaration", Appx pp. 000919-000982.

*LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007).  A court considering a motion for summary judgment must consider all facts and evidence in the light most favorable to the nonmoving party. *Id.*  (citing *United Fire & Cas. Co. v. Hixson Bros., Inc.*, 453 F.3d 283, 285 (5th Cir. 2006)).   Moreover, a court must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh the evidence. *Vaughn*, 665 F.3d at 635 (5th Cir. 2011) (citing *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 896 (5th Cir. 2002)).  In addition, a court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (citation omitted).

## B.    Fraudulent Transfers Occurred As a Matter of Law

Section 548 (a) of the Bankruptcy Code states in pertinent part:

> the Trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily . . . made such transfer or incurred such obligation with actual intent to hinder, delay or defraud any entity to which the debtor was or became . . . indebted.

11 U. S. C. § 548 (a)(1)(A). The statute has four elements:

- a Transfer
- of the Debtor's interest in property
- within two years of filing
- with intent to hinder delay or defraud.

Where the four elements are proved, a fraudulent transfer has occurred as a matter of law, and summary judgment is proper.  The summary judgment evidence conclusively establishes the fraudulent transfers in this case.

### 1.    Transfers Occurred

The Bankruptcy Code defines "transfer" as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with (i) property; or (ii) an

interest in property." 11 U.S.C. § 101(54)(D).  The Supreme Court has held that what constitutes a transfer for purposes of Section 548 is a question of federal bankruptcy law, and is any "disposition of an interest in property.  The definition . . . is as broad as possible." *Barnhill v. Johnson*, 503 U.S. 393, 398 (1992), *See also* S.Rep. No. 95-989, 95th Cong.2d Sess. 27 (1978) The Fifth Circuit and the Southern District of Texas have cited *Barnhill* on this matter.  *See Besing v. Hawthorne*, 981 F.2d 1488, 1492 (5th Cir. 1993); *Weaver v. Kellogg*, 216 B.R. 563, 573 (Bankr. S.D. Tex. 1997).

As previously noted,[67] Ruthven admits receipt of transfers totaling $48,812,882.24. There is no factual dispute here.

### 2.    Of the Debtor's Interest in Property

The transfer must be of property belonging to the debtor, which the Supreme Court has held to be the same thing as "property of the estate," as defined in Bankruptcy Code § 541.  *See Begier v. IRS*, 496 U.S. 53, 59 (1990).  Following *Begier*, Circuit courts have further held "property of the debtor" is property that would have been part of the estate, had it not been transferred before the commencement of bankruptcy proceedings.  *See, e.g., Stevenson v. J.C. Bradford & Co.,* 277 F.3d 838, 849–50 (6th Cir. 2002); *Warsco v. Preferred Tech. Group*, 258 F.3d 557, 564 (7th Cir. 2001).

Ruthven admitted that $48,812,882.24 in cash was transferred from Provident,[68] so Provident clearly had "an interest" in the sums transferred from its bank accounts.  Therefore, those monies fall squarely under the definition of "debtor's interest in property" in Section 548 (a).  There is no factual dispute here.

---

[67] See Section I, p. 1, and accompanying footnote, particularly Ruthven Admissions, Appx. pp. 1084-1111.
[68] See Section I, p. 1, and accompanying footnote, particularly Ruthven Admissions, Appx. pp. 1084-1111.

### 3.   Within Two Years of the Bankruptcy Petition's Filing

Ruthven further admitted to transfers on particular dates between June 23, 2007, and June 22, 2009.[69] Provident filed chapter 11 petitions on June 22, 2009.[70]

The transfers therefore occurred within the statutory two years required by 11 U. S. C. § 548 (a) (1).  There is no factual dispute here.

### 4.   With Intent to Hinder, Delay or Defraud

Although intent to defraud is generally proved indirectly, this case contains overwhelming direct evidence of intent to defraud.[71]  The direct proof appears in two different forms: (1) guilty pleas admitting conduct fitting the Fifth Circuit's definition of a Ponzi scheme; and (2) a detailed tracing of funds showing that a Ponzi scheme occurred.

Blimline and Melbye admitted expressly to the operative facts of a Ponzi scheme.  The business records and tracing show cash flows characterizing not only securities fraud generally, but Ponzi schemes in particular.  Either the company records or the guilty pleas, by themselves, would establish fraudulent intent; together, they leave no room for argument.

---

[69] See Section I, p. 1, and accompanying footnote, particularly Ruthven Admissions, Appx. pp. 1084-1111.

[70] Roossien Declaration, Ex. 114 (without exhibits), Fourth Amended Disclosure Statement filed in the chapter 11 case, Appx app. 000817-000897.

[71] Proving a debtor's intent to hinder, delay, or defraud is often difficult, since no self-respecting con artist will admit that he defrauded anybody.  Typically, therefore, proof of intent to defraud must be made indirectly, through common law "badges of fraud," and indeed, they are legion in this matter.  A debtor's intent to hinder, delay, or defraud can also be demonstrated indirectly by evidence of recognized "badges of fraud," such as: (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.  *In re Rangers Baseball*, 498 B.R. 679, 712 (N.D.Tex.Bankr. 2013)  This case is unusual in that proving "badges of fraud" is not necessary, because of the abundant direct evidence of the Ponzi scheme generated by Provident and the Defendants themselves.

a)   **Because Provident Was a Ponzi Scheme, the Transfers were Made with Fraudulent Intent**

The Fifth Circuit has held that a Ponzi scheme has the following characteristics and effects: [72]

> A Ponzi scheme is a scheme whereby a corporation operates and continues to operate at a loss.  The corporation gives the appearance of being profitable by obtaining new investors and using those investments to pay for the high premiums promised to earlier investors.  The effect of such a scheme is to put the corporation farther and farther into debt by incurring more and more liability and to give the corporation the false appearance of profitability in order to obtain new investors.

*Janvey v. Alguire*, 647 F.3d 585, 597 (5th Cir. 2011), (citing *Hirsch v. Arthur Andersen*, 72 F. 3d 1085, 1088, n. 3 (2d Cir. 1995)). [73]   The facts in this case follow the *Janvey* pattern, as well as that of Blimline's previous fiasco, the JRR Enterprise: Provident always operated at a loss; appeared profitable by paying earlier investors with later investors' money; and went further and further into debt, until the scheme collapsed.

The Fifth Circuit has made clear the facts to be established to prove a Ponzi scheme:

- Documents demonstrating that investor funds were used to make payments to other investors;
- A credible declaration providing clear, numerical support for the creative reverse engineering undertaken by the Ponzi scheme; and
- Specific itemization of the company's assets and payments.

*Am. Cancer Soc'y v. Cook*, 675 F.3d 524, 528 (5th Cir. 2012).   The Roossien Declaration, attached to this Brief and cited throughout it, establishes each of the Fifth Circuit's requirements.

---

[72] The term "Ponzi scheme" comes to us from Charles Ponzi, who operated a fraudulent investment scheme in the 1920s, where large dividends to earlier investors were paid with the investments of later investors, until the dividend obligations became so great that the scheme collapsed of its own weight.  *See Cunningham v. Brown*, 265 U.S. 1, 7–9, 44 S. Ct. 424, 68 L. Ed. 873 (1924), which discusses how Mr. Ponzi structured his scheme, and how it collapsed.

[73] This definition is in the mainstream of judicial interpretation of what constitutes a Ponzi scheme.  See, *e.g.*, *Hayes v. Palm Seedlings Partners-A*, 916 F.2d 528, 531 (9th Cir. 1990) ("[a] Ponzi scheme is an arrangement whereby an enterprise makes payments to investors from the proceeds of a later investment rather than from profits of the underlying business venture, as the investors expected."); *Bear, Stearns Sec. Corp. v. Gredd*, 397 B.R. 1, 8 (S.D.N.Y. 2007) ("in such a scheme, money from new investors is used to pay artificially high returns to earlier investors in order to create an appearance of profitability and attract new investors so as to perpetuate the scheme"); *see also* Mark A. McDermott, *Ponzi Schemes and the Law of Fraudulent and Preferential Transfers*, 72 Am. Bankr. L.J. 157, 157–58 (1998).

The Declaration not only proves conclusively that later investors' funds were used to pay earlier investors, but also provides clear numerical support for its assertions. Together, the Declaration and Ruthven's admissions establish that the funds belonging to the Debtors were paid to Ruthven.

Courts in the Northern District of Texas have routinely used factual declarations, such as an SEC Receiver's, to determine the existence of a Ponzi scheme. *See, e.g., Quilling, Receiver v. 3D Marketing, LLC*, 2007 WL 631281, *2 (N.D. Tex. 2007). In *Quilling*, the court found that expert testimony was not necessary to determine the existence of a Ponzi scheme. The *Quilling* court found sufficient the factual declaration of the Receiver in an SEC enforcement action. The declaration provided a detailed analysis demonstrating that: virtually all of the revenue came from later investor funds; investor funds were commingled; and returns paid to investors were actually payments from later contributors' commingled funds.

Once a Ponzi scheme is proved, the Fifth Circuit holds that intent to hinder, delay or defraud has also been established:

> The Receiver satisfied his burden with evidence of Appellants' receipts from [the debtor] and evidence that [the debtor] was a Ponzi scheme, which is, as a matter of law, insolvent from its inception. The Receiver's proof that RDI operated as a Ponzi scheme established the fraudulent intent behind transfers made by RDI. .

*Warfield v. Byron*, 436 F. 3d 551 (5th Cir. 2006) (citations omitted). The court recently cited *Warfield* for that proposition. *Janvey v. Alguire*, 628 F.3d 164, 175 (5th Cir. 2010) ("transfers made from a Ponzi scheme are presumptively made with intent to defraud, because a Ponzi scheme is, as a matter of law, insolvent from inception."); *Quilling v. Schonsky*, 247 Fed. Appx. 583, 586 (5th Cir. 2007) ("A record custodian's analysis of bank records and sworn testimony to Ponzi scheme asset distribution is enough to shift the burden of proof to the non-movant."). The

same principle is widely followed in other Circuits.[74] The reasoning underlying this rule — that proving existence of a Ponzi proves fraud — is simple and straightforward:

> A Ponzi scheme cannot work forever. . . The perpetrator . . . must know all along . . . that investors at the end of the line will lose their money. . . and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them.

*Merrill v. Abbott*, 77 B.R. 843, 860-61 (D. Utah 1987) (en banc).

With the transferor's intent to defraud established, the transferee's state of mind is irrelevant, because Section 548(a)(1)(A) contains no reference to the recipient's state of mind or knowledge.  Only the debtor's intent to defraud matters, and that has been amply demonstrated above.  *See, e.g., Jackson v. Mishkin*, 263 B.R. 406, 444-45 (S.D.N.Y. 2001); *Gouveia v. Cahillane*, 408 B.R. 175, 191 (Bankr. N.D. Ind. 2009) (noting focus is on state of mind of debtor; culpability of transferee is not essential); *Leonard v. Coolidge*, 367 B.R. 207, 221 (Bankr. D. Nev. 2007) ("It is key in this analysis that the required intent to hinder, delay or defraud is the debtor's; no collusion with the transferee is necessary.")

**b)     The Blimline and Melbye Guilty Pleas Prove Their Intent to Defraud**

Proof that an entity was engaged in a Ponzi scheme can also be premised on a guilty plea, since guilty pleas are admissible as an exception to the hearsay rule:

> Evidence of final judgment, entered after a trial or upon a plea of guilty (but not upon a plea of nolo contendere), adjudging a person guilty of a crime punishable by death or imprisonment in excess of one year, [is admissible] to prove any fact essential to sustain the judgment.

FED. R. EVID. 803 (22).  The facts above establish that the principal admissions in Blimline's and Melbye's guilty pleas prove that their actions were done with intent to defraud.  The leading case

---

[74] *Hayes v. Palm Seedlings Partners*, 916 F.2d 528, 535–536 (9th Cir. 1990); *Plotkin v. Pomona Valley Imports, Inc.* 199 B.R. 709, 717 (B.A.P. 9th Cir. 1996); *Bear, Stearns Sec. Corp. v. Gredd*, 397 B.R. 1, 11 (S.D.N.Y 2007); *Drenis v. Haligiannis*, 452 F. Supp. 2d. 418, 429 (S.D.N.Y. 2006); *Merrill v. Abbott*, 77 B.R. 843 (D. Utah 1987); *Emerson v. Maples,* 161 B.R. 644 (Bankr. W.D. Tenn. 1993).

on this issue in the fraudulent transfer context comes from Judge Posner's opinion in *Scholes v. Lehmann*, where he notes that:

> Taken together, *the facts just recited, most of which come right out of Douglas's plea agreement, which was admissible though hearsay,* and of which the district court properly took judicial notice under Fed. R. Evid. 201 . . . *established the defendants' liability.* . . Admissions – in a guilty plea . . . as elsewhere – are admissions; they bind a party; and the veracity safeguards surrounding a plea agreement that is accepted as the basis for a guilty plea and resulting conviction actually exceed those surrounding a deposition.

*Scholes v. Lehmann*, 56 F.3d 750, 762 (7th Cir. 1995) (emphasis supplied, citations omitted).

The Northern District of Texas has also recognized that reliance on a guilty plea to establish a Ponzi scheme is permissible. *See Janvey v. Democratic Senatorial Campaign Committee, Inc., et al.*, 793 F.Supp. 2d 825 (N.D. Tex. 2011) *aff'd sub nom. Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 699 F.3d 848 (5th Cir. 2012) *opinion withdrawn and superseded,* 712 F.3d 185 (5th Cir. 2013) and *aff'd sub nom. Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185 (5th Cir. 2013). In support, the court cited *In re Slatkin*, 525 F.3d 805, 812-13 (9th Cir. 2008), for the holding that a Ponzi schemer's plea was admissible under the Federal Rules of Evidence as competent summary judgment evidence to establish a Ponzi scheme.

*Slatkin* explained why such a broad preclusive effect was appropriate:

> there is good reason for giving the Plea Agreement such weight. The issue of a debtor's intent in a fraudulent transfer avoidance action is a subjective inquiry. . . While, typically, fraudulent intent would need to be established using circumstantial evidence, here we have *direct* evidence, in the form of an admission by Slatkin, that he had the actual intent to defraud his creditors. . . Furthermore, Slatkin pleaded guilty to mail fraud and wire fraud, both of which include as elements the creation and execution of a fraudulent scheme and intent to defraud. Slatkin's Plea Agreement, therefore, is direct evidence of his actual intent to defraud.

*Slatkin,* 310 B.R. at 748.  Slatkin's admissions that he intended to defraud, and his guilty pleas to both mail fraud and wire fraud, exactly parallel the Blimline and Melbye guilty pleas.  This Court should also give the "Plea Agreement such a broad preclusive effect as to foreclose any opportunity for [defendants] to offer evidence disproving that [the debtor] had fraudulent intent with respect to the specific transactions in which they were involved." *Id.*

In the same context, a California district court held that "the Bankruptcy Court did not abuse its discretion by relying on the Plea Agreement in granting the Trustee's motion for partial summary judgment." *In re Slatkin,* 310 B.R. 740, 745 (C.D. Cal. 2004).  In holding the guilty plea had preclusive effect, the court noted that a number of other courts had followed *Scholes* in relying on guilty pleas or jury's guilty verdicts to find actual intent to defraud citing *In re Rodriguez*, 209 B.R. 424, 433 (Bankr. S.D. Tex. 1997) ("the criminal conviction of Ms. Rodriguez based on the debtors' operation of a Ponzi scheme conclusively establishes fraudulent intent, and precludes the defendant from relitigating the issue"); *Martino v. Edison Worldwide Capital*, 189 B.R. 425, 439 (Bankr. N.D. Ill.1995) ("the debtor's actual intent to defraud his investors 'was established by the jury verdict against him in the criminal proceeding' and granted summary judgment in favor of the trustee."); *Emerson v. Maples,* 161 B.R. 644, 648 (Bankr. W.D. Tenn. 1993), *aff'd*, 1995 US. App. LEXIS 16053 (6th Cir. 1995) ("the debtors' intent to defraud creditors was established by the guilty pleas to the related criminal charges, and preclusive effect may be given to those guilty pleas as factual findings to the extent that the debtors' intent to defraud creditors is required in this adversary proceeding.")

### c)  The Intent to Defraud Is Imputed to Provident

The intent of the two most powerful individuals in Provident — Blimline and Melbye — are imputed to Provident.  The fraud of an officer of a corporation is imputed to the corporation when the officer's fraudulent conduct was (1) in the course of his employment, and (2) for the

benefit of the corporation.  This is true even if the officer's conduct was unauthorized, effected for his own benefit but clothed with apparent authority of the corporation, or contrary to instructions.  The underlying reason is that a corporation can speak and act only through its agents and so must be accountable for any acts committed by one of its agents within his actual or apparent scope of authority and while transacting corporate business.  *See, e.g., McNamara v. PFS*, 334 F.3d 239, 243 (3d Cir. 2003); *U. S. ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 727 F. 3d 343, 355 (5th Cir. 2013) ("in corporate law, the acts of a corporation's vice-principals are considered to be the acts of the corporation itself and are imputed to the corporation." ); *Consove v. Cohen,* 701 F.2d 978, 984 (1st Cir. 1983) (imputing to corporation fraudulent intent of corporate officer and sole shareholder); see also *Leonard v. Coolidge,* 367 B.R. 207, 221 (Bankr. D. Nev. 2007); *Dahar v. Jackson*, 318 B.R. 5, 14 (Bankr. D.N.H. 2004).  Blimline's and Melbye's stipulations to fraudulent intent therefore govern in these transactions.

### 5.      No Affirmative Defense of Value and Good Faith

The Bankruptcy Code provides that one receiving an otherwise fraudulent transfer "for value and in good faith" may retain the property transferred, or a lien upon it.  11 U.S.C. § 548(c).  The defense requires proving *both* elements: showing only value, or only good faith, is insufficient.  *O'Cheskey v. Horton*, 2011 Bankr. LEXIS 3837, at 64-5 (Bankr. N.D.Tex. 2011).

Although dealing in good faith and for value is the usual defense to a fraudulent transfer suit, the record shows that it is not available to Ruthven.

### a)      No Good Faith

In the context of a Section 548 fraudulent transfer claim under the Bankruptcy Code, the Fifth Circuit has held that:

> good faith is determined by looking at what the transferee "objectively knew or should have known instead of examining the transferee's actual knowledge from a subjective standpoint."  [The transferee's] failure to inquire about [the Debtor] more closely, in the light of the abundant suspicious information he possessed

about the people, the scheme, and the previous schemes, raises serious questions
about his good faith defense.

*Warfield*, 436 F.3d at 559-60.  In the present case, the uncontradicted testimony establishes that

the warning signs confronting Ruthven and its principal Holland were legion, yet they chose to

disregard them:

- Holland was a longstanding Blimline associate.[75]

- Holland did not trust Blimline.[76]

- Holland was an "Insider."[77]

- The warnings continued, and Holland continued to disregard them.[78]

- Ruthven's own business practices call its good faith into question.[79]

- Ruthven's compensation arrangement with Provident so lopsidedly favored it that it had to know something was wrong.[80]

The Fifth Circuit has provided practical guidance on what a person should do when faced

with such warning signs.  In *Jimmy Swaggert Ministries v. Hayes*, 310 F. 3d 796 (5th Cir. 2002),

the court considered a situation in which Swaggert had given an option a real estate developer to

---

[75]Roossien Declaration, Ex. 102: Lincoln County deed, PRLP1213291-2, Appx pp. 000780-000781; Ex. 103: Blimline 016930-016939, Appx pp. 000782-000791.

[76] Roossien Declaration at 22-25, ¶¶ 67-71, Appx pp. 000066-000069; Ex. 11, Appx app 000141; Ex. 58-65, Appx app. 00284-00365; Ex. 35, p. 3: Blimline guilty plea, Appx app. 000192; Ex. 104: 5/31/05, Appx pp. 000793; Ex. 105: 6/01/05 emails, Appx pp. 000794; Ex. 107: 8/4/06 email, Appx pp. 000796; Ex. 108: 9/23/06 email, Appx pp. 000797.

[77] Roossien Declaration, Ex. 109: 12/29/06 email, Appx pp. 000798; Ex. 110: Board/Officer/Stockholder/Employee Questionnaire for Shale 3, Appx pp. 000799; Ex. 111: Executive Summary circulated for Shale 3 PPM, Appx pp. 000806-000807; Ex. 112: Shale 3 management and advisory board biographies, Appx pp. 000808-000810; Holland, p. 144.2-7, Appx pp. 001018.

[78] Holland, pp. 94.10-17, Appx pp. 001006; 96.21-24, Appx pp. 001007; Holland pp. 48.5-49.6, Appx pp. 000997-000998; Roossien Declaration, Ex. 113: Phoenix Petroleum deed to Holland dated 9/21/10, Appx pp. 000811; Holland, p. 53.14-22, Appx pp. 001001; pp. 168.20-170.18, Appx pp. 001022-001024; Holland pp. 48.5-49.6, Appx pp. 000997-000998; pp.51.8-52.22, 000999-001000.

[79] Holland, pp. 58.3-59.8, Appx pp. 001002-001003; Holland, pp. 60.23-61.11, 001004-001005; Holland, as corporate representative of the Holland Trust, 2/27/13 deposition, p. 41.4-.24, Appx pp. 001074; Holland, as corporate representative of the Holland Trust, 2/27/13 deposition, p. 41.25-42.25, Appx pp. 001074-001075; Hatcher pp. 45.5-46.4, Appx pp. 001080-001081; Shutt, p. 41.2-9, Appx pp. 001052; K. Holland, p. 128.22-130.6, Appx pp. 001039-001041.

[80] Holland pp. 14.15-15.5, Appx pp. 000991-000992; pp. 110.18-111.12, 001008-001009; p. 113.3-8, Appx pp. 001010; pp. 146.19-147.25, 001019-001020; Shutt, pp. 25.6-26.1, Appx pp. 001050-001051; Holland, pp. 202.12-203.2, Appx pp. 001026-001027; Shutt pp. 117.22-118.1, Appx pp. 001057-001058; Holland pp. 46.23-47.13, Appx pp. 000995-000996; pp. 142.22-143.14, Appx pp. 001016-001017; Shutt pp. 115.21-116.1, Appx pp. 001055-001056; Holland p. 153.4-9, Appx pp. 001021; p. 196.8-17, Appx pp. 001025; Holland, pp. 113.20-114.18, Appx pp. 001010-001011; Shutt pp. 169.12-170.22, Appx pp. 001059-001060; Kari Holland p. 89.5-8, Appx pp. 001038.

purchase land owned by the ministry.  Thereafter, Swaggert learned that the developer was the

subject of an SEC Equity Receivership:

> being duly alarmed by these newspaper stories, undertook its own investigation,
> contacting the SEC and the federal district court, eventually receiving assurances
> from the district court that JSM could continue to receive option payments.

*Id.* at 800.  That is just the sort of inquiry that Ruthven and Holland could have made in response

to any number of disturbing disclosures, but which they never did.[81]

In evaluating a similar Ponzi transaction, one Northern District Bankruptcy Court

observed that the transferee "had to know and be accountable for his direct involvement . . . . to

determine whether good faith exists, the court looks to whether 'the transaction carries the

earmarks of an arms-length bargain.'"  (*O'Cheskey* LEXIS 3837, at 65, 67)  As shown above,[82]

Defendant's long history and close dealings with Blimline, larded with multiple warnings and

outsized compensation received, destroy any defense of good faith.  While Ruthven was making

millions off Provident, uncontradicted testimony establishes that it contracted out the actual work

to a landman for $175 per day, plus retirement benefits.[83]  Ruthven's own testimony further

establishes that it never used its own money to buy the properties and so took no financial risk:

as soon as it received the funds from Provident to buy the acreage, it immediately caused a series

of property flips from the landowners, through the other Defendants or related parties, and finally

to Provident.  Each flip involved a substantial price hike, well beyond anything reasonable in the

market, and typically the flips occurred either the same day or within days of each other.[84]  None

of these transactions were arms-length bargains: they were a conscious fraud.

---

[81] Holland pp. 48.5-49.6; pp. 51.8-52.22, Appx. pp. 000997-001000.
[82] Section IV.C., pp. 8-11.
[83] Shutt, pp. 25.6-26.1, Appx pp. 001050-001051.
[84] Holland, pp. 202.12-203.2, Appx pp. 001026-001027; Shutt pp. 117.22-118.1, Appx pp. 001057-001058

Ruthven bears the burden of establishing its affirmative defenses.  It cannot meet its burden because it lacks evidence of good faith, and the factual record proves no such evidence can exist.

### b)    No Value

According to the Fifth Circuit, whether a transferee gives value in the fraudulent transfer context "is determined from the standpoint of creditors. . . The proper focus is on the net effect of the transfers on the debtor's estate, the funds available to unsecured creditors." *Hinsley v. Boudloche*, 201 F. 3d 638, 644 (5th Cir. 2000).  Similarly, *Warfield v. Byron* holds that "the primary consideration in analyzing the exchange of value for any transfer is the degree to which the transferor's net worth is preserved." 436 F.3d at 560.  It is clear that Provident did not receive value for the transfers.

Ruthven cannot prove that it gave value.  In response to the itemized list of transfers provided with the Complaint,[85] its Answer provides nothing more than a bald statement that it provided "value" in exchange for the amounts Provident paid.[86]  Subsequent discovery is equally barren of substance for Ruthven: the best it can manage is to assert that the transactions were those of willing buyer and seller,[87] ignoring the Fifth Circuit requirement that value must be shown from the standpoint of whether value was objectively exchanged. *Warfield*, 436 F.3d at 559-60.

Ruthven bears the burden of establishing value.  Here, it has no evidence of value, and the existing evidence runs overwhelmingly contrary to the notion that any value was ever provided.

---

[85] Complaint at Ex. A thereto, Dkt. 39-1, Appx pp. 000023-000024.
[86] First Amended Answer at 18, Appx pp. 000042.
[87] See discussion above, Section IV. D., p. 12, and Roossien Declaration: Ex. 115, Wendell Holland Response to Interrogatory No. 21, Appx pp. 000898-000900.

## VI.   CONCLUSION

No disputed issue of material fact exists in this matter.  Transfers of Provident's property of $48,812,882.24 to Ruthven occurred within two years of the filing of the bankruptcy case. Those transfers were made by Provident with intent to hinder, delay or defraud creditors and the estate as understood under 11 U.S.C. § 548(a)(1)(A).  The defense of taking for value and in good faith is not available.  The Court should avoid the transfers of $48,812,882.24 set out in the Motion at n..9 and render judgment against Ruthven for the amount pleaded.

Dated: April 21, 2014

Respectfully submitted,

MILO H. SEGNER, JR., as Liquidating
Trustee of the PR Liquidating Trust, Plaintiff

_____/s/ Michael R. Rochelle_____
One of His Counsel

OF COUNSEL:

Jerry C. Alexander
Texas Bar No. 00993500
Christopher A. Robison
Texas Bar No. 24035720
PASSMAN & JONES, P.C.
1201 Elm Street, Suite 2500
Dallas, Texas 75270-2599
P: (214) 742-2121
F: (214) 748-7949

Michael R. Rochelle
Texas Bar No. 17126700
Sean J. McCaffity
Texas Bar No. 24013122
ROCHELLE MCCULLOUGH L.L.P.
325 N. St. Paul, Suite 4500
Dallas, Texas 75201
P: (214) 953-0182
F: (214) 953-0185

Andrew B. Sommerman
Texas Bar No. 18842150
George (Tex) Quesada
Texas Bar No. 16427750
SOMMERMAN & QUESADA, L.L.P.
3811 Turtle Creek Blvd., Suite 1400
Dallas, Texas 75219
P: (214) 720-0720
F: (214) 720-0184

Jerry Kenneth (J.Ken) Johnson, II
Texas Bar No. 10746300
FLEMING NOLEN JEZ L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, Texas 77056
P: (713) 621-7944
F: (713) 621-9638

## CERTIFICATE OF SERVICE

I hereby certify that counsel of record for all Defendants has elected to receive electronic service, which will accordingly be accomplished automatically upon the filing hereof.

/s/ Michael R. Rochelle